UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


WILLIAM RUSSELL GARDNER, *et al.*,

                Plaintiffs,                       Case No.  1:12cv1338 - LEAD

vs.                                       Hon. Robert J. Jonker

JASON EVANS, *et al.*,

                Defendants,
_____/    **CONSOLIDATED**

HENRY LEE HOLSEY,

                Plaintiff,                       Case No. 1:12cv914

vs.                                       Hon. Robert J. Jonker

AARON WIEBER, SCOTT SANFORD,
and THE CITY OF LANSING,
                Defendants,
_____/


## OPINION

### INTRODUCTION

       These consolidated cases involve five sets of parties, similar factual circumstances, and partially overlapping claims.  In each case, law enforcement officers executed a search warrant.  In the aftermath of each search, the Lansing Police Department requested that a city housing code compliance officer inspect the premises, and a law enforcement officer admitted the compliance officer into the residence to conduct the inspection.  In each instance, a compliance officer entered the residence without a separate administrative warrant.  Each time, the housing inspection resulted

in the residence being declared unfit for occupancy.  The residents of each dwelling had to leave their homes immediately pending correction of the housing violations the compliance officers identified. The residents did not receive advance notice of the inspections.  Nor did Defendants provide any notice of a right or process for appeal of the compliance officers' decisions.

Plaintiffs bring individualized claims linked to search warrants, arrests, and charges in their respective cases.  Plaintiffs' overlapping claims focus on the law enforcement officers' requests that compliance officers inspect premises after execution of the search warrants; the compliance officers' entries and inspections without administrative warrants or consent;[1] and the compliance officers' failure to provide pre- and post-deprivation notice concerning the inspections and right to appeal. Plaintiffs name as defendants the law enforcement officers who sought the search warrants; the compliance officials who inspected the premises; and the City of Lansing.[2]  The matter is before the Court on defense motions for summary judgment.  The Court has heard oral argument on the motions; thoroughly reviewed the record; and carefully considered the applicable law.  The motions are ready for decision.[3]

---

[1]In some cases consent is a disputed issue of fact.  For purposes of evaluating Defendants' summary judgment motion, the Court must accept Plaintiffs' version of the facts.  Accordingly, the Court presumes there was no consent.

[2]Plaintiffs' First Amended Complaint also asserts claims against unnamed Lansing Police Officers ## 1-3.  Discovery has closed.  The record reflects no effort by the Plaintiffs to serve the unnamed officers or to amend the complaint to name the officers.  The Court will therefore dismiss the claims as to the unnamed officers.  *See Petty v. County of Franklin, Ohio*, 478 F.3d 341, 345 (6th Cir. 2007); FED. R. CIV. P. 4(m)("If service . . . is not made upon a defendant within 120 days after the filing of the complaint, the court . . .  shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time . . . .").

[3]The Court earlier granted partial summary judgment to the defense on Plaintiff Holsey's individualized claims.  Case No. 1:12-CV-914 (docket # 42).  Plaintiff Holsey's overlapping claims are addressed in this Opinion.

**BACKGROUND**

**1.   923 West Hillsdale**

Plaintiff William Russell Gardner owned and resided at 923 West Hillside in Lansing, Michigan. His daughter, Irma Gardner, also resided at 923 W. Hillsdale. In December 2009, Officer Jason Evans of the Lansing Police Department sought a search warrant for the premises and provided an affidavit to support the request. (Evans Aff., docket # 60, Ex. A.) The affidavit reflects that Officer Evans has been employed as a police officer by the City of Lansing Police Department for eleven years and is assigned to the Special Operations Section. (*Id.*) The affidavit explains that Special Operations Section "investigates controlled substances trafficking within the City of Lansing." (*Id.*) The affidavit describes a police report Mason [Michigan] Police Officer Lynne Mark prepared and which the Mason Police Department forwarded to the Lansing Police Department. (*Id.*) Officer Evans's affidavit summarizes:

> in Ofc. Lynne Mark's report it states that Ofc. Mark was approached by a citizen who stated that narcotics are being sold out of a W. Hillsdale address (City of Lansing) and guns have been involved. Ofc. Mark was handed a note with 'Oxicotton [sic] – Irma Gardner – Hillsdale – Lansing' from the citizen. . . . Ofc. Mark determined that a middle aged B/F lived at the W. Hillsdale residence. Ofc. Mark located an Erma Jean Gardner . . . at 923 W. Hillsdale.

(*Id.*)

Officer Evans pursued this lead. He avers that on December 9, 2009, he observed a garbage container in front of the residence at 923 W. Hillsdale positioned between the curb and the sidewalk for pick-up. (*Id.*) Officer Evans picked up the trash, placing it in the empty bed of a city-owned truck. (*Id.*) He searched through the garbage and recovered a substance that tested positive for cocaine; used packaging material; a used syringe tube; and residency paperwork for Erma G.

3

Williams, 923 W. Hillsdale.  (*Id.*)  A search of the Lansing Police Department database revealed that "Erma G. Williams" and "Irma Gardner" are the same person.  (*Id.*)  Based on the information he had obtained, and on his experience and training, Officer Evans asserted that "the controlled substances laws have been and are being violated within the premises to be searched and the violations are ongoing and controlled substances will be found in the premises."  (*Id.*)  A judge approved the warrant request the evening of December 9, 2009.  (Search Warrant, docket # 60, Ex. A.)

The Special Operations Section of the Lansing Police Department executed the search warrant on December 12, 2009.  (Incident Report, docket # 60, Ex. D.)  Officer Evans was not present for the execution of the search warrant.  (Evans dep., docket # 60, Ex. C.)  The search of the residence yielded crack cocaine, scales, drug paraphernalia, a handgun, and ammunition.  (Incident Report, docket # 60, Ex. D.)  Officers arrested four people, including Plaintiff Gardner.  (*Id.*)  Mr. Gardner was charged with possession of less than 25 grams of a controlled substance.  (docket # 65, Ex. 2.)  The charge was later dismissed.

During the execution of the search warrant, police officers "damaged or disabled smoke/fire detectors, dumped food and cooking ingredients on the floor and countertops, removed chilled or frozen meat from the refrigerator/freezer and left it out to spoil, dumped over beds and furniture, broke a door off a kitchen cabinet, removed clothing and other personal items from closets, cabinets, and dressers[,] leaving . . . pathways blocked and cluttered."  (First Am. Compl, docket # 5, ¶ 46.)[4]

_____

[4]The First Amended Complaint in the *Gardner* case includes a signed and dated statement from each plaintiff entitled "Verification and Signature."  Each plaintiff states, "I . . . have reviewed the factual allegations [specific to my claims] and verify that they are true to the best of my knowledge, information, and belief."  (docket # 1.)  The attorney for Plaintiffs has also signed each statement.  Plaintiffs' motion papers suggest that by virtue of these signed statements, Plaintiffs have

In the aftermath of the search, the Lansing Police Department requested that a housing code compliance officer inspect the premises.  (Brand dep., docket # 60, Ex. E.)  Code Compliance Officer David Brand responded to the request, arriving at 923 Hillsdale while some of the law enforcement officers were still present.  (*Id.*)  According to Plaintiff Gardner, neither Defendant Brand nor anyone else requested or obtained his permission to inspect his home.  (Gardner aff., docket # 65, Ex. 2.)[5]  Defendant Brand inspected the house and found housing code violations that included, among others, improper electric service panel installation; bare wiring near a water source; a gas hot water heater without a permit or inspection tag; and a deteriorating gas furnace. (Correction Notice, docket # 60, Ex. E.)  Based on the violations he found, Defendant Brand declared the house unsafe for occupancy.  In Lansing, such a declaration is sometimes referred to as a "red-tag," because in that city, a red marker is placed on a house declared unsafe for occupancy. The practical effect of a "red-tag" is that the occupants of a house must leave immediately and may not occupy the house until the violations have been corrected.  Defendant Brand did not provide Mr. Gardner with notice or an opportunity for hearing before the inspection or red-tagging decision.

---

verified their complaint properly, but Plaintiffs are mistaken.  The statements are not notarized.  That alone is not dispositive, because 28 U.S.C. § 1739 allows for "unsworn declarations under penalty of perjury" to support any matter that legally requires an affidavit.  But to qualify, a declaration must "comport to the following form: 'I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.  Executed on (date).'" *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475 (6th Cir. 2002) (quoting 28 U.S.C. § 1739).  Plaintiffs' verifications are inadequate because they do not invoke the "penalty of perjury" requirement, and are made, at least in part, on information and belief.  Affidavits or declarations must be based on personal knowledge, not information and belief, and may otherwise be disregarded.  FED. R. CIV. P. 56(c)(4).  Even so, for purposes of this Opinion, the Court will treat the allegations in the First Amended Complaint as though they were properly verified.

[5]Defendant Brand states that Mr. Gardner gave him permission to inspect.  (Brand dep., p. 23, Defs.' Br., Ex. E.)  For the purposes of summary judgment analysis, the Court accepts as true Mr. Gardner's statement to the contrary and makes no factual finding on this disputed point.

He did not inform Mr. Gardner of a right to appeal or a process for appealing.  Nor did the red-tag itself provide this information.

A Correction Notice to Mr. Gardner issued on December 11, 2009.  (*Id.*)  It details the housing code violations Defendant Brand identified.  (*Id.*)  The Correction Notice states that "a partial inspection was conducted by Code Compliance Officer David Brand.  Due to the condition of the dwelling, a complete inspection could not be done.  A complete inspection is required and all code violations must be corrected and then approved by this office prior to occupancy."  (*Id.*)  The Correction Notice establishes a "compliance due date" of January 11, 2010, and notes that "[f]ailure to comply by the compliance due date may result in the issuance of a Municipal Civil Infraction Violation with Fines: $500 per day for each violation."  (*Id.*)  The Correction Notice informs the recipient that he "must contact the under signed [sic], no later than seven days before the compliance due date, to set up an appointment to meet at the structure (to verify that all corrections have been completed) or to acquire an authorized extension." (*Id.*)  It notes that "[b]efore the re-inspection you must obtain all required permits and have those repairs inspected and approved by the appropriate inspector."  (*Id.*)  It provides an option to call with "any questions or concerns about complying within the time indicated" during limited hours.  (*Id.*)  The Correction Notice says nothing about a right to appeal or an appeal process.  (*Id.*)

Invoking 42 U.S.C. § 1983, Plaintiff Gardner brings claims against Defendants Evans, Brand, and the City of Lansing for violations of his rights under the Fourth and Fourteenth Amendments of the Constitution: A)  Plaintiff Gardner bases his claims against Defendant Evans on the following theories: (1) the search warrant was invalid, because the affidavit did not support a finding of probable cause; (2) law enforcement officers unreasonably damaged or destroyed property during

the search; (3) Mr. Gardner was arrested and charged without probable cause;[6] and (4) law enforcement officers impermissibly invited and admitted a code compliance officer into the residence to conduct an inspection without an administrative warrant or consent.  B) Plaintiff Gardner asserts that Defendant Brand violated his rights under the Constitution because he: (1) entered and inspected Mr. Gardner's home without an administrative warrant or consent; (2) red-tagged Mr. Gardner's home without any pre-deprivation notice or opportunity for hearing; and (3) failed to provide Mr. Gardner with any post-deprivation notice of the right to appeal or process for doing so.  C) Plaintiff Gardner asserts that the City of Lansing violated his rights under the Fourth and Fourteenth Amendments of the Constitution because it had a policy and practice under which: (1) police officers impermissibly invited and admitted code compliance officers into residences to conduct inspections without administrative warrants or consent; (2) housing code officials entered and inspected residences without an administrative warrant or consent; (3) housing code officials inspected and red-tagged homes without any pre-deprivation notice or opportunity for hearing; (4) housing code officials red-tagged homes and imposed correction requirements without providing any post-deprivation notice of the right to appeal or process for doing so.

## 2.    1539 Lansing Avenue

Plaintiffs Gilbert Gonzalez and Rebecca Mora resided at 1539 Lansing Avenue in Lansing, Michigan.  On May 8, 2010, Officer Scott Ellis of the Lansing Police Department sought a search warrant for the premises. (Ellis aff., docket # 60., Ex. F.)  In his affidavit supporting the request, Officer Ellis details, among other things, a conversation with a cooperating individual who told him

---

[6]Plaintiff Gardner also brings state law claims of false arrest and malicious prosecution on this theory.  His state law claims stand or fall with the parallel constitutional claims.

that he had been buying marijuana for the past four or five years from two sellers, a man and a woman, at 1539 Lansing Avenue; had been assisting the woman by finding buyers in exchange for marijuana since February 2010; and on May 7, 2010 had seen approximately 400 pounds of marijuana in brick form in the basement bathroom at the house.  (*Id.*)  The cooperating individual also told Officer Ellis that the previous month he had seen a semi-automatic carbine rifle with a "banana" clip on it in the kitchen at the home.  (*Id.*)  Officer Ellis states that the information the cooperating individual provided was consistent with information provided by another law enforcement officer, Agent Bailey, who told Officer Ellis he had been investigating narcotics and firearms related activity at 1539 Lansing since the fall of 2009.  (*Id.*)  Agent Bailey described to Officer Ellis a controlled buy in which a cooperating defendant purchased half an ounce of powder cocaine from a man called "Flaco" (Mr. Gonzalez) at the home.  (*Id.*)  The cooperating defendant informed Agent Baily that Flaco told him that he had purchased two Uzi firearms from someone in Detroit.  (*Id.*)  The cooperating defendant also said that he had observed two clips loaded with ammunition on the kitchen table at the home.  (*Id.*)  A magistrate issued the search warrant on May 10.  (Search Warrant, docket # 60, Ex. F.)

Members of the Special Tactics and Response Team ("START"), the Special Operations Section, Uniform Patrol, and federal agents met for a briefing before executing the search warrant.  (Incident Report, docket # 60, Ex. G.)  They determined,

> [b]ased on the criminal history of Gonzalez, the information known about other subjects believed to be in the residence and involved with Gonzalez, the presence of firearms in the possession of and in the residence of Gonzalez and the apparent willingness of Gonzalez and others to use the firearms to prevent their apprehension by police . . . that START would deploy Light/Sound Diversion Devices upon entry into the house.

(*Id.*)  The START officers divided into two teams to execute the warrant, one to clear the upstairs, the other the downstairs.  (*Id.*)  When they arrived at the house, they knocked on a door, announced that they were police with a search warrant, and broke down the door with a ram.  (*Id.*)  Plaintiffs Gonzalez and Mora assert that START team members discharged one distraction device (also called a "flash-bang") into the basement level of the house, and another into the kitchen on the first floor, "without any force or threat of force being directed at the officers by any occupants of the dwelling." (First Am. Compl., docket # 5, ¶¶ 126-127.)  Plaintiff Gonzalez alleges that the flash-bang directed toward the basement caused a projectile to strike his head, "leaving an abrasion and contusion."  (*Id.* at ¶ 180.)  The next day, after posting bond, he sought medical treatment and was diagnosed with a concussion. (*Id.* at ¶ 182.)  Plaintiff Mora alleges that one of the officers executing the search grabbed her hair and violently shook her head back and forth, causing "significant pain."  (*Id.* at ¶ 185.)  Plaintiffs Gonzalez and Mora state that the officers executing the search warrant "damaged or disabled smoke/fire detectors, dumped over beds and furniture, removed clothing and other personal items from closets, cabinets and dressers leaving hallways, passageways, doorways and other pathways blocked and cluttered, and placed flammable materials near pilot lights."  (*Id.* at ¶ 136.)

In the aftermath of the search, the Lansing Police Department requested that a housing code officer inspect the premises.  Code Compliance Officer Steve Malone responded to the request. (Correction Notice, docket # 60, Ex. H.)   Defendant Malone found housing code violations that included, among others, combustibles stored too close to the furnace; handrail missing on the basement stairs; lack of operational smoke detector in basement and first floor hallway; a damaged side door; and a lack of a continuous, unobstructed path from any point in the structure to a public

way.  (*Id.*)  Defendant Malone concluded that the house was unsafe for occupancy and red-tagged the house.  He did not provide any notice to Plaintiffs before inspecting the house and did not advise them of any right to or process for an appeal.

A different code compliance officer, Vince Cantrell, who is not named as a defendant, issued a Correction Notice the same day the inspection took place.  (*Id.*)  The Correction Notice follows the same general format as the Correction Notice issued to Mr. Gardner and the other plaintiffs in this case.  It details the violations identified and provides a compliance due date of approximately five weeks from the date of the Correction Notice.  (*Id.*)  It states that failure to comply by the compliance due date "may result in the issuance of a Municipal Civil Infraction Violation with Fines: $500 per day for each violation."  (*Id.*)  It informs the recipient that he or she "must contact the under signed [sic], no later than seven days before the compliance due date, to set up an appointment to meet at the structure (to verify that all corrections have been completed) or to acquire an authorized extension."  (*Id.*)  It provides a phone number at which to call Officer Cantrell during specified hours "[i]f you have any questions or concerns about complying within the time indicated."  (*Id.*)  It states nothing about a right to an appeal or an appeal process.  (*Id.*)

Invoking 42 U.S.C. § 1983, Plaintiffs Gonzalez and Mora  bring claims against Defendants Ellis, Malone, and the City of Lansing:[7] A) They assert that Defendant Ellis violated their rights under the Fourth and Fourteenth Amendments of the Constitution based on the following theories: (1) excessive force based on the use of the distraction devices and an officer grabbing Ms. Mora's hair and shaking her head; (2) law enforcement officers unreasonably damaged or destroyed property

---

[7]Plaintiffs Gonzalez and Mora do not challenge the validity of the search warrant or their arrests.

10

during the search; and (3) law enforcement officers impermissibly invited and admitted a code compliance officer into the residence to conduct an inspection without an administrative warrant or consent. B) Plaintiffs Gonzalez and Mora assert that Defendant Malone violated their rights under the Constitution because he: (1) entered and inspected their home without an administrative warrant or consent; (2) red-tagged their home without any pre-deprivation notice or opportunity for hearing; and (3) failed to provide them with any post-deprivation notice of the right to appeal or process for doing so. C) Plaintiffs Gonzalez and Mora assert that the City of Lansing violated their rights under the Constitution based upon a policy and practice under which (1) police officers impermissibly invited and admitted code compliance officers into residences to conduct inspections without administrative warrants or consent; (2) housing code officials entered and inspected residences without administrative warrants or consent; (3) housing code officials inspected and red-tagged homes without any pre-deprivation notice or opportunity for hearing; (4) housing code officials red-tagged homes and imposed correction requirements without providing any post-deprivation notice of the right to appeal or process for doing so.

### 3. 1043 Bensch Street

Plaintiff Keosha Louden resided at 1043 Bensch Street in Lansing, Michigan. Lansing Police Officer Dylan Zehr sought a search warrant for the premises on April 16, 2010. (Defs.' Br., Ex. N.) In his affidavit, Officer Zehr states that he is employed by the City of Lansing Police Department; has served for approximately twelve years; and has been assigned to the Special Operations Section of the Department for the past four years. (*Id.*) Officer Zehr describes CI 772 as reliable based on previous investigations in which he used CI 772. (*Id.*) Officer Zehr states that he "has been investigating suspected traffic in the controlled substance of crack cocaine from and within 1043

Bensch Street." (*Id.*) He describes a controlled buy in which CI 772 purchased crack cocaine at the residence on April 15, 2010. (*Id.*) A magistrate approved the request and issued the search warrant on April 16, 2010. (*Id.*)

Law enforcement officers, including members of START, patrol officers, and SOS officers executed the search on April 16, 2010. (Defs.' Br., Ex. P.) Officer Zehr was among the officers who executed the search. According to Plaintiff Louden, while searching the home, police officers "damaged the residence by clogging up a pipe in the basement and causing sewage to accumulate, dumping over beds, removing clothing and other personal items from closets, cabinets and dressers leaving hallways . . . and other pathways blocked and cluttered." (First Am. Compl., docket # 5, ¶ 201.) Plaintiff Louden says that officers emptied garbage bags in the basement; removed food from the refrigerator and cabinets and left it on the floor, "causing an infestation of rodents and insects[;]" emptied a wastebasket in a bedroom onto the bed; knocked an electrical outlet loose; stuffed foreign objects into ducts; and placed flammable materials near appliances with pilot lights." (*Id.*)

At the conclusion of the search, the Lansing Police Department requested a housing inspection. Officer Scott Sanford conducted the inspection. (docket # 60., Ex. Q.) Officer Sanford found code violations that included, among others, a clogged waste pipe and sewage on the floor in the basement; uncleanliness and decay of surfaces "likely to cause sickness or disease;" other unsanitary conditions; and loose electrical wiring. (*Id.*) He concluded that the house was unsafe for occupancy and red-tagged the house. He provided neither pre-deprivation notice or hearing, nor post-deprivation notice of appeal rights or process for appeal. A Correction Notice issued on

April 19, 2010.  It follows the same form as the Correction Notices issued in the other cases.  (*Id.*)

It does not speak of a right to appeal or process for doing so.

Invoking 42 U.S.C. § 1983, Plaintiff Louden brings claims against Defendants Zehr, Sanford, and the City of Lansing for violations of her rights under the Fourth and Fourteenth Amendments of the Constitution: A) Plaintiff Louden bases her claims against Defendant Zehr on the following theories: (1) law enforcement officers unreasonably damaged or destroyed property during the search; and (2) law enforcement officers impermissibly invited and admitted a code compliance officer into the residence to conduct an inspection without an administrative warrant or consent.[8] B) Plaintiff Louden asserts that Defendant Sanford violated her rights under the Constitution because he: (1) entered and inspected her home without an administrative warrant or consent; (2) red-tagged her home without any pre-deprivation notice or opportunity for hearing; and (3) failed to provide her with any post-deprivation notice of the right to appeal or process for doing so.  C)  Plaintiff Louden asserts that the City of Lansing violated her rights under the Fourth and Fourteenth Amendments of the Constitution because it had a policy and practice under which: (1) police officers impermissibly invited and admitted code compliance officers into residences to conduct inspections without administrative warrants or consent; (2) housing code officials entered and inspected residences without administrative warrants or consent; (3) housing code officials inspected and red-tagged homes without any pre-deprivation notice or opportunity for hearing; (4) housing code officials red-tagged homes and imposed correction requirements without providing any post-deprivation notice of the right to appeal or process for doing so.

_____

[8]Plaintiff Louden has abandoned her challenge to the validity of the search warrant.

### 4. 3622 Karen Street

Plaintiffs James Hudson, Roosevelt Hudson, and Javon Hudson resided at 3622 Karen Street. On April 30, 2010, Officer John Cosme sought a search warrant for the premises. Officer Cosme's affidavit reflects that he has been employed by the City of Lansing Police Department for twelve years and is assigned to[9] the Special Operations Section. (docket # 60, Ex. I.) Officer Cosme states that he received information from an anonymous source on April 17, 2010, that the residence at 3622 Karen Street "is a drug house." (*Id.*) Officer Cosme avers that James Hudson owns the residence at 3622 Karen Street. (*Id.*) He states that in 2006, a search warrant executed at 3622 Karen Street resulted in seizure of marijuana, heroin, crack cocaine, and ten firearms, and that James Hudson was arrested at the time of that 2006 search. (*Id.*) According to the affidavit, on April 10, 2010, Officer Cosme conducted a trash pull of five blue City of Lansing trash bags positioned between the curb and sidewalk for pickup in front of 3622 Karen Street. (*Id.*) He recovered a plastic baggie that tested positive for the presence of cocaine and residency paperwork for James Preston Hudson. (*Id.*) The search warrant request was approved and issued on April 30, 2010. Law enforcement officers executed the warrant the same day. (*Id.*) The search yielded, among other things, residency paperwork, packaging materials, marijuana, U.S. currency, drug paraphernalia, and bullets. (*Id.*) The packaging material tested positive for the presence of cocaine. (*Id.*) A digital scale with a white residue was found in a vehicle parked in the driveway of the premises. (*Id.*) The white residue tested positive for cocaine. (*Id.*)

---

[9]In his deposition, Officer Cosme acknowledged that the specified dates – April 10 for the trash pull, and April 17 for the anonymous tip – were likely incorrect, because he would not have undertaken the trash pull until after receiving the anonymous tip. (docket # 60, Ex. J, at p. 18.) Whether the trash pull occurred on April 10 or April 17 does not change the analysis of Plaintiffs' claim that the warrant was based on stale information.

Plaintiffs James Hudson, Roosevelt Hudson, and Javon Hudson were present when the officers executed the search. All three were arrested and eventually charged with frequenting a drug establishment. (*Id.*) Plaintiff Anthony Jackson, Jr., the grandson of Plaintiff James Hudson, fled the residence when the officers arrived for the search. (*Id.*) He was apprehended, arrested, and charged. (*Id.*; First Am. Compl., docket # 5, at ¶ 361.) Plaintiff Savoy Jackson also fled the scene on foot when the officers arrived to execute the warrant. (docket # 60, Ex. K.) He carried his four-year-old daughter in his arms. (*Id.*) Officer Chad Frazier observed Savoy Jackson lift the child over a six-foot privacy fence, drop her to the ground below, and climb over the fence himself. (*Id.*) Officers soon apprehended Savoy Jackson. He was arrested and charged with frequenting a drug establishment and child abuse. (*Id.*) Ultimately, the charges against all of these plaintiffs were dismissed. (First Am. Compl., docket # 5, at ¶ 363.)

According to Plaintiff James Hudson, police officers executing the search damaged his residence by, among other things, "kicking doors which were unlocked, kicking open locked doors after keys had been offered, dumping over beds, removing clothing and other personal items from closets, cabinets and dressers leaving . . . pathways blocked and cluttered, disabling smoke/fire detectors." (*Id.* at ¶ 285.)

During or immediately after the search, the Lansing Police Department requested a safety inspection from the Office of Code Compliance. (docket # 60, Ex. L.) Code Compliance Officer Gregg Scrimger inspected the premises while Lansing Police Officers were still on site. (*Id.*) He found violations of the housing code including, among others: no permit for the furnace installation had been issued, and the furnace installation had not been inspected and approved; no permit for the water heater installation had issued, and the water heater had not been inspected and approved;

various electrical problems; missing stair treads; and uncleanliness or decay likely to cause sickness or disease. (*Id.*) Officer Scrimger red-tagged the house. He did not notify the residents before doing so, and he did not inform them of any right to appeal or process for appeal. A Correction Notice issued. The Correction Notice follows the same form as the notices provided to the other plaintiffs. It says nothing about a right to appeal or process for appeal.

Invoking 42 U.S.C. § 1983, the Hudson and Jackson Plaintiffs bring claims against Defendants Cosme, Sanford, and the City of Lansing for violations of their rights under the Fourth and Fourteenth Amendments of the Constitution: A) The Hudson Plaintiffs assert that Defendant Cosme violated their rights under the Constitution based on the following theories: (1) the search warrant was invalid, because the affidavit did not support a finding of probable cause; (2) law enforcement officers unreasonably damaged or destroyed property during the search; (3) they were arrested and charged without probable cause; and (4) law enforcement officers impermissibly invited and admitted a code compliance officer into the residence to conduct an inspection without an administrative warrant or consent. Plaintiffs Anthony Jackson, Jr. and Savoy Jackson also bring claims against Defendant Cosme for false arrest and malicious prosecution.[10] B) The Hudson Plaintiffs assert that Defendant Scrimger violated their rights under the Constitution because he: (1) entered and inspected the Hudsons' residence without an administrative warrant or consent; (2) red-tagged the residence without any pre-deprivation notice or opportunity for hearing; and (3) failed to provide them with any post-deprivation notice of the right to appeal or process for doing so. C) The Hudson Plaintiffs assert that the City of Lansing violated their rights under the Constitution because

---

[10]The Hudson and Jackson Plaintiffs also bring state law claims of false arrest and malicious prosecution on this theory. Their state law claims stand or fall with the parallel constitutional claims.

it had a policy and practice under which (1) impermissibly invited and admitted code compliance officers into residences to conduct an inspection without an administrative warrant or consent; (2) housing code officials entered and inspected residences without an administrative warrant or consent; (3) housing code officials inspected and red-tagged homes without any pre-deprivation notice to residents or opportunity for hearing; (4) housing code officials red-tagged homes and imposed correction requirements without providing any post-deprivation notice of the right to appeal or process for doing so.

### 5.    1316 Pompton Circle

Plaintiff Henry Lee Holsey resided at 1316 Pompton Circle in Lansing, Michigan at the time the events giving rise to his claims occurred.  In June of 2009, Defendant Aaron Wieber, whom the City of Lansing had employed as a police officer for approximately eleven years, sought a search warrant that encompassed Plaintiff Holsey's residence.  On June 22, 2009, law enforcement officers executed the search warrant.[11]   Plaintiff Holsey states that in conducting the search, the officers damaged his property:

> I had to pick up what [the] officers had messed up; they dumped out clothes – they took all my clothes out of the closet, they flipped my bed, they busted bags of cornmeal, they busted bags of flour, they dumped my deep freezer, they dumped everything out of my deep freezer, they had toilet paper, dish soap – in my bathroom, if you walked on the floor you would have fell because they had empty bottles of shampoo on my floor.  I don't have pictures but it looked like a hurricane.

---

[11]Plaintiff Holsey originally also challenged the validity of the search warrant under which officers performed the search and the reasonableness of the execution of the search.  The Court granted a defense motion for summary judgment as to these claims and took Mr. Holsey's remaining claims under advisement.  (Case No. 1:12-CV-914, docket # 42.)

Defendant Wieber was not present when the officers entered 1316 Pompton Circle.  He states that he "arrived a significant amount of time after the searching was already done," and stayed "less than five minutes."  (Wieber dep. at 33.)

After the search of Mr. Holsey's residence began, the Lansing Police Department requested that a housing code compliance officer inspect the premises.  Defendant Scott Sanford responded to the request.  A Sergeant Johnson, who is not named as a defendant, admitted him.  Defendant Sanford does not recall what the dispatch supervisor told him specifically, but notes that "[n]ormally, they tell us that we're requested at a certain address by officers because they have violations or they wanted us to check safety or check something on the house."  (Case No. 1:12-CV-914, docket # 21, Ex. E, Sanford dep.)  Defendant Sanford inspected the residence and found violations of the housing code.  Based on these violations, he red-tagged the house.  It is undisputed that Defendant Sanford did not provide notice to Mr. Holsey before red-tagging the house and that he did not tell Mr. Holsey how to appeal the red-tagging decision.  It is also undisputed that Mr. Holsey received no notice from any other source regarding his right to appeal the decision or the process for appealing.

Plaintiff Holsey asserts that Defendant Wieber violated his rights under the Fourth Amendment by admitting Defendant Sanford into his residence even though Defendant Sanford had neither an administrative warrant nor consent.  Plaintiff Holsey asserts that Defendant Sanford violated his rights under the Fourth and Fourteenth Amendments of the Constitution because he: (1) entered and inspected his home without an administrative warrant or consent; (2) red-tagged his home without any pre-deprivation notice or opportunity for hearing; and (3) failed to provide him with any post-deprivation notice of the right to appeal or process for appealing.  Plaintiff Holsey asserts that the City of Lansing violated his rights under the Constitution because it had a policy and

practice under which (1) police officers improperly requested that housing code compliance officials inspect premises and admitted them into residences without administrative warrants or consent; (2) housing code officials entered and inspected residences without administrative warrants or consent; (3) housing code officials inspected and red-tagged homes without any pre-deprivation notice or opportunity for hearing; (4) housing code officials red-tagged homes and imposed correction requirements without providing any post-deprivation notice of the right to appeal or process for doing so.

## LEGAL STANDARDS

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 363 (6th Cir. 2009) (quoting FED. R. CIV. P. 56). The moving party must "inform the district court of the basis for its motion," and it must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (internal quotation marks omitted). "In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party." *Id.* (quotation omitted).

Governmental actors are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335,

341 (1986).  "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry.  The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]'"  *Tolan v. Cotton*, 572 U.S. __, 134 S. Ct. 1861, 1865 (2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation."  *Id.* at 1866 (quoting *Hope*, 536 U.S. at 739).  "[T]he salient question . . . is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional."  *Id.* (internal quotation marks omitted) (alterations in original).  Courts have discretion to decide the order in which to address the two prongs.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  At summary judgment, courts must draw inferences in favor of the nonmovant, even when a court decides only the clearly-established prong of the standard.  *Tolan*, 134 S. Ct. at 1866.

For qualified immunity purposes, "clearly established" means that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."  *Id.* (internal citation omitted).  The Supreme Court has explained that the term "clearly established" "depends largely 'upon the level of generality at which the relevant 'legal rule' is to be identified.'"  *Wilson v. Layne*, 526 U.S. 603, 614–15 (1999) (quoting *Anderson*, 483 U.S. at 639).  The Court has instructed courts to define the federal right at issue in the specific context of the case, and to take

care not to define a case's context in a manner that imports a genuinely disputed factual proposition. *Tolan*, 134 S. Ct. at 1866.

For a constitutional right to be clearly established, "the law must be clear in regard to the official's particular actions in the particular situation." *Saylor v. Bd. of Educ.*, 118 F.3d 507, 515 (6th Cir. 1997). "[T]he particular conduct of the official must fall clearly within the area protected by the constitutional right, such that a reasonable official would have known that his or her conduct violated the constitutional right." *Id.* "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*." *Id.* (quoting *Lassiter v. Ala. A & M Univ., Bd. of Trs.*, 28 F.3d 1146, 1150 (11th Cir. 1994)) (emphasis in original).

To establish municipal liability under § 1983, a plaintiff must establish that a constitutional violation caused his or her harm, and that the city was responsible for the violation. *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009) (citing *Cash v. Hamilton County Dept. of Adult Probation*, 388 F.3d 539, 542-43 (6th Cir. 2004)). Municipal liability for such harms exists only if the implementation of official policies or established customs caused the harm. *Id.* (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 708 (1978) (Powell, J., concurring)). To prove an illegal policy or custom, a plaintiff may look to "'(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations.'" *Id.* (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). The plaintiff must also show "a direct causal link between the policy and the alleged constitutional

21

violation in order to show that the municipality's deliberate conduct can be deemed the moving force behind the violation." *Id.* (quotations omitted.)  It is possible to show that a municipality has "a custom causing constitutional violations, even if that custom was not formally sanctioned, provided that the plaintiff offers proof of policymaking officials' knowledge and acquiescence to the established practice." *Id.* (quotations omitted.)

## I. INDIVIDUALIZED CLAIMS

### 1.    Validity of Search Warrants

Plaintiff Gardner and the Hudson Plaintiffs challenge the validity of the search warrants authorizing the searches of the residences at 923 W. Hillsdale and 3622 Karen Street, respectively. The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by oath or affirmation . . . ." U.S. CONST. AMEND. IV.  Probable cause "is found to exist when there is a 'fair probability' that evidence of a crime will be located on the premises of the proposed search." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (internal quotation omitted). Courts evaluate the validity of search warrant affidavits "based on the totality of the circumstances, rather than line-by-line scrutiny." *Id.*  "Review of sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit." *Id.*  A reviewing court "will uphold a probable cause determination if the issuing judge had 'substantial basis for concluding that a search would uncover evidence of wrongdoing,'" *U.S. v. Archibald*, 685 F.3d 553, 557 (6th Cir. 2012) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983), and "will reverse only if the issuing judge's determinations were arbitrarily exercised." *Id.*

A.  *923 W. Hillsdale*

Plaintiff Gardner contends that the affidavit Officer Evans provided with the search warrant request fails to support a finding of probable cause.  The Court disagrees.  The affidavit establishes probable cause.  The affidavit details a specific report to Officer Mark that included references to Irma Gardner; the street name; the type of drug being sold; and the involvement of guns.  The affidavit does not rely upon this report alone; it provides independent corroborating evidence.  The affidavit describes a trash pull Officer Evans conducted at 923 W. Hillsdale that yielded cocaine; a used syringe tube; packaging material; and residency paperwork for Ms. Gardner.  The affidavit reflects that Officer Evans has eleven years of experience in law enforcement, including experience in enforcing drug laws.  Cumulatively, this information provides a substantial basis to conclude that a search would uncover evidence of wrongdoing.  *See Archibald*, 685 F.3d at 557.

Plaintiff Gardner protests that the affidavit fails to establish a sufficient nexus with the property to be searched and that the report to Officer Mark lacks sufficient indicia of reliability.  These arguments are unavailing.  The affidavit details a trash pull at 923 W. Hillsdale that yielded cocaine, a used syringe, and packaging materials, supporting a "fair probability" that a search of 923 W. Hillsdale would uncover evidence of wrongdoing.  The affidavit does not rely solely upon the report to Officer Mark, but includes sufficient corroboration to establish probable cause.  *See Jackson*, 470 F.3d at 307-08 (explaining that an affidavit that includes sufficient corroborating information may support a finding of probable cause, even if the affidavit supplies little information about an informant's reliability).

Plaintiff Gardner also argues that the warrant was based on stale information and therefore invalid.  This argument also fails.  "[I]n seeking to establish probable cause to obtain a search

warrant, the affidavit may not employ 'stale' information,' and whether information is stale depends on 'the inherent nature of the crime.'" *United States. v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010) (quoting *United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir. 1988)). To analyze whether information in an affidavit for a search warrant is stale, the Court considers the following factors:

> (1) the character of the crime (chance encounter in the night or regenerating conspiracy?),
> (2) the criminal (nomadic or entrenched?),
> (3) the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?), and
> (4) the place to be searched (mere criminal forum of convenience or secure operational base?).

*United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009) (citation omitted). Application of these factors shows that the information supporting the warrant for 923 W. Hillsdale was not stale. Officer Mark's report was dated December 3, 2009. It described a report of ongoing drug transactions conducted by a resident of 923 W. Hillsdale. Officer Evans received the report on December 4, 2009. Officer Evans conducted the trash pull at 923 W. Hillsdale on December 9, 2009. The trash pull that day yielded illegal drugs, packaging material, and evidence that Irma Gardner resided at 923 W. Hillsdale. Officer Evans sought the warrant, and the warrant issued, on December 9, 2009. The record belies the claim that the information in the affidavit was stale.

    *B.    3622 Karen Street*

    The Hudson Plaintiffs contend that the search warrant for their residence was constitutionally deficient because it was, in their view, based on stale information. There is no evidence in the record that the trash pull occurred earlier than April 10, 2010. The warrant issued on April 30, 2010. The crime at issue was drug trafficking from a particular residence – more a regenerating conspiracy by an entrenched criminal from a secure operational base than a fleeting encounter. *See Frechette*, 584

F.3d at 378.  Under *Frechette*, the information in the affidavit was not stale.  The Hudson Plaintiffs'
challenge to the search warrant fails

### 2.        Validity of Arrests

Plaintiff Gardner, the Hudson Plaintiffs, and the Jackson Plaintiffs challenge the validity of
their arrests.  "A false arrest claim under federal law requires a plaintiff to prove that the arresting
officer lacked probable cause to arrest the plaintiff."  *Voyticky v. Village of Timberlake, Ohio*, 412
F.3d 669, 677 (6th Cir. 2005).  Probable cause is "reasonable grounds for belief, supported by less
than prima facie proof but more than mere suspicion."  *United States v. McClain*, 444 F.3d 556, 562
(6th Cir. 2005) (internal quotation marks omitted).  To determine whether an arresting officer had
probable cause to arrest a plaintiff, the Court must consider "the totality of the circumstances and
whether the 'facts and circumstances' of which [the arresting officer] had knowledge at the moment
of the arrest would justify a prudent person in believing that the arrested person had committed an
offense."  *Sykes v. Anderson*, 625 F.3d 294, 306 (6th Cir. 2010).

### A.        *Plaintiff Gardner*

Plaintiff Gardner contends that his arrest was unconstitutional because probable cause did
not support the arrest.  He brings his false arrest claim against Defendant Officer Evans.  The
unrebutted record reflects that Officer Evans was not present at the time of the arrest.  Accordingly,
Officer Evans is entitled to judgment as a matter of law.  But Plaintiff Gardner's claim of false arrest
would fail on the merits in any event.  The facts and circumstances of which the arresting officer had
knowledge at the moment of the arrest support a reasonable conclusion that Mr. Gardner had
committed an offense.  In Mr. Gardner's home, officers executing the search warrant found crack
cocaine; scales; drug paraphernalia; a handgun; and ammunition.  The presence of these items in

Mr. Gardner's house bespeak involvement in drug trafficking and would justify a prudent person in believing that Mr. Gardner had violated the law. For these reasons, Mr. Gardner's false arrest claim fails.

B.     Hudson and Jackson Plaintiffs

The Hudson and Jackson Plaintiffs also contend that their arrests were unconstitutional based on a lack of probable cause. They bring their false arrest claims against unnamed officers they have not joined as parties in the case. Therefore, the claims are not properly before the Court. The claims would fail on the merits in any event. The facts and circumstances of which the arresting officers had knowledge at the moment of arrest support a reasonable conclusion that the Hudson and Jackson Plaintiffs had committed an offense. When officers arrived to conduct the search, each of the Jackson Plaintiffs fled the scene, one of them carrying a small child. On the premises, officers found marijuana, packaging materials, drug paraphernalia, bullets, cocaine residue, and a digital scale, among other things. The totality of the circumstances would justify a prudent person in believing that the Hudson Plaintiffs, who resided at the house, and the Jackson Plaintiffs, who fled the scene, had violated the law. Probable cause supported the arrest of the Hudson and Jackson Plaintiffs. Their false arrest claims fail.

3.     **Malicious Prosecution**

Plaintiff Gardner, and the Hudson and Jackson Plaintiffs, bring claims of malicious prosecution. "The Sixth Circuit recognizes a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment." *Sykes*, 625 F.3d at 308. "The Fourth Amendment conditions warrants on probable cause and prohibits unreasonable seizures. A police officer violates those restrictions only when his deliberate or reckless falsehoods result in arrest and prosecution

without probable cause." *Newman v. Twp. of Hamburg*, __ F.3d__, 2014 WL 7003773, * 1 (6th Cir.,

Dec. 12, 2014).   The claim that results, which "might be called an 'unreasonable prosecutorial

seizure' claim, is traditionally known as a 'malicious prosecution' claim." *Id.*  A claim for malicious

prosecution is "'entirely distinct' from that of false arrest, as the malicious-prosecution tort 'remedies

detention accompanied not by absence of legal process, but by wrongful institution of legal

process.'" *Sykes*, 625 F.3d at 308 (quoting *Wallace v. Kato*, 549 U.S. 384, 390 (2007) (emphasis in

original).  To succeed on a claim for malicious prosecution premised on a violation of the Fourth

Amendment, a plaintiff must prove:

> [f]irst . . . that a criminal prosecution was initiated against the plaintiff and that the
> defendant made, influenced, or participated in the decision to prosecute. . . . Second,
> because a § 1983 claim is premised on the violation of a constitutional right, the
> plaintiff must show that there was a lack of probable cause for the criminal
> prosecution. . . . Third, the plaintiff must show that, as a consequence of a legal
> proceeding, the plaintiff suffered a deprivation of liberty, as understood in our Fourth
> Amendment jurisprudence, apart from the initial seizure . . . . Fourth, the criminal
> proceeding must have been resolved in the plaintiff's favor.

*Id.* at 308-09 (internal quotations omitted).

For the precisely same reasons probable cause existed for the arrests of Plaintiff Gardner and

the Hudson and Jackson Plaintiffs, probable cause supported the prosecution of all of these plaintiffs.

Based on the items found at the 923 West Hillsdale premises, a reasonable officer or prosecutor

could infer that Plaintiff Gardner was involved in drug trafficking.  Similarly, based on the items

found at the Karen Street premises, a reasonable officer or prosecutor could conclude that the

Hudson and Jackson Plaintiffs were involved in drug trafficking.  Moreover, there is no record

evidence that any of the plaintiffs were deprived of liberty apart from the initial seizure.  Plaintiff

Gardner and the Hudson and Jackson Plaintiffs' claims of malicious prosecution fail.

27

### 4.    Excessive Force

Plaintiffs Gonzalez and Mora bring claims of excessive force.  The record reflects that Plaintiffs Gonzalez and Mora have not joined as parties the officers they say used excessive force against them.  Accordingly, the claims against these unnamed officers are not properly before the Court.  *See Petty v. County of Franklin, Ohio*, 478 F.3d 341, 345 (6th Cir. 2007); FED. R. CIV. P. 4(m) ("If service . . . is not made upon a defendant within 120 days after the filing of the complaint, the court . . . shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time . . . .").  Even if the claims were properly before the Court, they would fail.  In determining whether the use of the flash-bang amounted to excessive force under the Fourth Amendment, a reasonableness standard applies.  *Krause*, 765 F.3d at 680; *Graham v. Connor*, 490 U.S. 386, 395 (1989).  The reasonableness standard requires the Court "to balance the plaintiff's interest to be free from unlawful seizure with the government's interests, one of which is safety of its police officers."  *Graves v. Bowles*, 419 F. App'x 640, 643 (6th Cir. 2011).  The Court must "judge reasonableness from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Krause*, 765 F.3d at 680 (quotation marks omitted).

Here, a reasonable officer on the scene might well determine to take extra precautionary measures based on the information available at the time of the search.  This information included, among other things, awareness of Mr. Gonzalez's criminal history; a report from a confidential informant that he recently had seen a semi-automatic rifle and banana clip in the kitchen at the residence; and a report from another confidential informant that he had observed two clips loaded with ammunition at the residence and that Mr. Gonzalez had told him that he had purchased two Uzi firearms.  Under these circumstances, an officer could reasonably conclude that the risk of harm to

officer safety outweighed the risk of harm the use of the flash-bang devices might cause. Accordingly, the use of the flash-bang devices here did not amount to excessive force.  Ms. Mora alleges that an officer used excessive force by grabbing her hair and shaking her head, but there is no record evidence that she complained of any injury, sought medical attention, or sustained any injury.  Given a well-founded concern that the residents of the house might be armed, a reasonable officer might determine that some physical restraint of Ms. Mora was needed to help ensure officer safety.  On this record, the force allegedly used against Ms. Mora did not amount to excessive force.

### 5.    Execution of Search Warrants

It is well established that "officers executing search warrants on occasion must damage property in order to perform their duty." *Dalia v. United States*, 441 U.S. 238, 258 (1979).  As with other Fourth Amendment inquiries, "'the manner in which a warrant is executed' – including the damage of property – 'is subject to later judicial review as to its reasonableness.'" *U.S. v. Whisnant*, 391 F. App'x 426, 429–30 (quoting *Dalia*, 441 U.S. at 258).  In applying this standard in a section 1983 case, a court "must determine not whether destruction was 'reasonably necessary to effectively execute a search warrant' but whether the plaintiff has raised factual issues to be submitted to the jury on this point." *Hill v. McIntyre*, 884 F.2d 271, 278 (6th Cir. 1989) (quoting *Tarpley v. Greene*, 684 F.2d 1, 9 (D.C. Cir. 1982).  The Court finds no factual issues to be submitted to the jury concerning the execution of the search warrants at any of the plaintiffs' residences.  A thorough search for evidence of drug trafficking would almost always involve emptying containers, drawers, cabinets, closets, refrigerators, and other storage receptacles.  This naturally has potential to create a mess.  Similarly, some incidental damage to entry and passage doors is a natural result of thorough

searching. On this record, Plaintiffs have not created a jury-submissible issue on whether officers exceeded reasonable limits in execution of the search warrants.

## Individualized Claims – Conclusion

For these reasons, Defendants are entitled to summary judgment on the various individualized claims Plaintiffs bring. Because Plaintiffs cannot succeed on their individualized claims of constitutional violations, to the extent Plaintiffs bring any policy and practice claim against the City of Lansing based on any such individualized claims, the policy and practice claim necessarily fails.

## II. OVERLAPPING CLAIMS

The remaining claims all involve the code inspection process that was part of each of the cases. There are three basic issues: (1) on the particular facts here, were code inspectors required to obtain a separate administrative warrant before accessing the premises; or was the invitation of the officers executing a valid search warrant sufficient; (2) did the code officers have a sufficient basis to exclude the occupants from their homes without any pre-deprivation notice or hearing; and (3) did Defendants provide a constitutionally appropriate post-deprivation review process, and give Plaintiffs appropriate notice of the process?

### 1. Entry and Inspection

When police officers enter a home under a valid search warrant, they "are temporarily placed in control of the premises and its occupants. It is as though the premises were given to the officers in trust for such time as may be required to execute their search in safety and then depart." *Bills v. Aseltine*, 958 F.2d 697, 704 (6th Cir. 1992). Under such circumstances, officers "routinely exercise unquestioned command of the situation." *Id.* (internal quotation omitted). Officers "may violate that

trust and exceed the scope of the authority implicitly granted them by their warrant when they permit unauthorized invasions of privacy by third parties who have no connection to the search warrant or the officers' purposes for being on the premises." *Id.* The principal question is whether the officers exceeded the scope of their authority under the warrant by inviting and admitting code compliance officers into residences to conduct inspections.

As a general rule, a housing inspector must obtain either consent or an administrative warrant before conducting a code compliance inspection. *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 534 (U.S. 1967). But this general rule does not "foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations." *Id.* at 539. Accordingly, "warrants should normally be sought only after entry is refused unless there has been a citizen complaint or there is other satisfactory reason for securing immediate entry." *Id.* at 539-40.

The Court concludes that the code inspectors had authority to enter Plaintiffs' premises on the strength of the criminal search warrant being executed by police officers without going through the formality of obtaining a separate administrative warrant. Each of the code searches involved here occurred during, or immediately after, execution of a criminal search warrant, and each was based on information directly observed by officers executing the search warrant. Under those circumstances, to require a code officer to obtain a separate administrative warrant would be an empty formality. Accordingly, to the extent Plaintiffs bring claims of constitutional violations against individual Defendant police officers and code officers, and against the City of Lansing, based on the entry of the code officers into premises at the request of the Lansing Police Department during or in the immediate aftermath of a warranted criminal search, the claims fail. The Court finds no

constitutional violation based on this claim.  Even if there were a constitutional violation, qualified immunity would protect the individual Defendant police officers and code officers, because there was no clearly established law precluding entry under the circumstances of Plaintiffs' cases.

### 2.    Pre- and Post-Deprivation Process

Ordinarily, due process "requires an opportunity for some kind of hearing prior to the deprivation of a significant property interest." *Hodel v. Virginia Surface Mining and Reclam. Ass'n, Inc.*, 452 U.S. 264, 299 (1981).  However, "summary administrative action may be justified in emergency situations." *Id.* at 300.  "Clearly, the Constitution requires some process incident to a taking of property at a meaningful time, which depending on the competing interests involved may either be before or after the deprivation." *Flatford v. City of Monroe*, 17 F.3d 162, 167 (6th Cir. 1994).  "A prior hearing is not constitutionally required where some valid governmental interest is at stake that justifies postponing the hearing until after [the deprivation]." *Id.*  Such interests include "[p]rotection of the health and safety of the public[,]" which is "a paramount governmental interest." *Hodel*, 452 U.S. at 301.  "Indeed, deprivation of property to protect the public health and safety is one of the oldest examples of permissible summary action." *Id.*  (Internal quotation omitted).

The *Flatford* court expressly addressed "what process is due when a government evicts its citizens from their home in an emergency and the allowance we should give public officials for any misjudgment of the circumstances." *Id.* at 165.  In *Flatford*, the Sixth Circuit considered a set of circumstances similar to those underpinning the overlapping due process claims here.  Officers executing a search warrant in an unrelated investigation entered the multi-unit apartment building in which the Flatford family resided. *Id.* at 165.  The officers reported unsafe conditions at the building to the City of Monroe's Director of Building Safety, Michael Bosanac. *Id.*  The next day,

Mr. Bosanec obtained an administrative inspection warrant and went on to inspect the premises. *Id.* There he found extensive dilapidation and disrepair, and he feared the building's tenants faced imminent risk of electrocution or fire. *Id.* Considering this an emergency situation, he posted condemnation signs on all entrances and ordered the building vacated within two and a half hours. *Id.* A thorough inspection took place two days later, and numerous code deficiencies were identified. *Id.* at 166. Mr. Bosanec notified the Flatfords' landlord of the inspection results; actions necessary to bring the building into compliance; and right to an administrative appeal, but he provided none of this information to the Flatfords. *Id.* The Flatfords "remained dispossessed of their home for almost two weeks without any judicial review of the emergency order to evacuate." *Id.* They later brought suit under section 1983 alleging that city officials evicted them from their apartment without the procedural due process the Fourteenth Amendment guarantees and in violation of the Fourth Amendment prohibition on unreasonable seizures. *Id.* at 165.

The court found that while due process ordinarily requires a notice and a hearing before an eviction, there exist "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the [eviction]." *Id.* at 167 (quotation marks omitted). Moreover, "[p]rotecting citizens from an immediate risk of bodily harm falls squarely within those 'extraordinary situations.'" *Id.* The court determined that the Flatfords had a clearly established right to a pre-eviction hearing only in the absence of exigent circumstances. *Id.* In *Flatford*, the risk of imminent harm to the building occupants qualified as an exigent circumstance that justified the eviction without a prior hearing. *Id.* The court found no constitutional violation in the failure to provide pre-deprivation notice in this emergency evacuation based on safety concerns.

33

The court reached a different conclusion regarding the failure to provide post-deprivation notice to the Flatfords. "The Due Process Clause requires truly remedial process at a meaningful time, which is determined by balancing the competing interests involved." *Id.* at 168-69. Factors considered include, without limitation, "the risk of government error, the importance of the protected interest, the length or finality of the deprivation, and the magnitude of the government interest." *Id.* at 169. The court found that for the Flatfords, fundamental fairness required, at a minimum, "notice in short order of the right to an administrative hearing, including the manner designated for timely review." *Id.* Tenants and others with possessory interests are entitled to the same notice of the right to an administrative hearing as a homeowner or landlord. *Id.* at 168. The court emphasized that notice and opportunity for hearing serves as a necessary check on the risk of government overreach:

> The requirement of an immediate and meaningful post-deprivation process becomes even more important in view of the license which qualified immunity essentially allows public officials when they make judgments affecting the health and safety of our citizens under perceived exigent circumstances . . . [T]he opportunity of an administrative hearing assures that fairness will quickly prevail and that constitutional rights, if mistakenly curtailed, will be immediately restored.

*Id.* at 169.

*Flatford* provides clear guidance in the cases now before the Court. On the particular facts of the cases, there was no constitutional violation in the red-tagging of the premises. The whole point of the red-tag process is to get people out of living spaces that are unsafe for human habitation. Here, the code officers identified conditions in each dwelling that met this standard. There was as a matter of law no constitutional violation in red-tagging the houses without a pre-deprivation hearing.

34

But with respect to the post-deprivation review process, and notice of that process, a jury could easily find the Defendants have plainly failed to comply with the requirement. At least since *Flatford*, it has been clearly established in this Circuit that a meaningful post-deprivation review process is constitutionally required, and that direct, personal notice of such a process to affected individuals is also required. Here, Plaintiffs – whether owners, occupants, or both – never received notice of the appeal process because no officer provided that notice to them and because neither the red-tag itself nor any other code compliance papers provided that information to Plaintiffs. The suggestion that the City ordinances may provide constructive notice sufficient to satisfy due process fails on multiple ground. First, *Flatford* requires actual notice, not constructive notice. Second, as the litigation history of this case demonstrates, finding the applicable City ordinances – whether on paper or online – is going to take longer than the twenty days the ordinances apparently allow for appeal. Finally, whether the ordinance even requires notice to tenants or others affected by the eviction is less than clear. In fact, in the Court's view, the issue was so clearly established by prior Sixth Circuit case law that Plaintiffs may be entitled to judgment as a matter of law against the individual code officers on this issue. Certainly the officers are not entitled to summary judgment in their favor.

Similarly, a jury could find against the City on the post-deprivation due process issue. In fact, the undisputed record reflects that the City of Lansing has a policy and practice of providing inadequate post-deprivation process to individuals whose homes are red-tagged – not only the Plaintiffs in this case, but all such individuals. *Flatford* plainly demands more than the City routinely provides. Neither the City's standard red-tag itself nor the standard correction notice provide any notice of a right or process for appeal, despite the clear requirements of *Flatford*. To

35

the extent the City's ordinances require better notice, the record of this case demonstrates the City

simply does not provide that notice in practice.  Moreover, even the ordinances on their face require

notice only to property owners.  (docket # 33, Attachment 2, § 107.2(5).)[12]  This is certainly

necessary under *Flatford*, but not enough.  *Flatford* also requires notice to the other directly-

impacted parties, such as tenants or other occupants evicted from the homes by the red-tag.  The

reason for the notice is obvious, as *Flatford* suggests: affected parties enjoy meaningful post-

deprivation review only if they have timely and direct notice of their appeal rights.  The City

ordinances provide that "[a]ny . . . person directly affected by a . . . decision of the Code Official

or a notice or order issued under this Code may appeal to the Building Board of Appeals . . . .

Written application for an appeal must be filed within 20 days of service of the decision, notice, or

order being appealed." (docket # 34, Attachment 5, Lansing City Ordinance 1460.01(q.)  And the

housing code also provides that "any affected person" who timely requests an appeal "shall

thereafter, upon petition directed to the appeals board, be afforded a hearing."  (IPMC, docket # 34,

Attachment 3, § 109.6.)  But these provisions benefit only those who are aware of the right to appeal,

and the code requires only that owners, not tenants and others with possessory interests, be informed

of the right to appeal.  Under *Flatford*, residents who are evicted due to safety concerns must receive

prompt notice of the right to appeal and process for doing so regardless of whether they own the

---

[12]The record reflects that the City of Lansing in November 2012 adopted an amended version of the International Property Maintenance Code of 2009 (docket # 34, Attachment 4.)  The record remains murky regarding what the City ordinances provided concerning a notice and appeal process at the time Plaintiffs' residences were red-tagged.  That the parties themselves have not been able to establish a clear record of the ordinances applicable at the time Plaintiffs were evicted from their residences further illustrates the fundamental problem of lack of notice and process.  To the extent this Opinion describes the City ordinances, the descriptions refer to the 2009 IPMC as amended and adopted by the City of Lansing in 2012.

property.  The City's own ordinance, as well as its undisputed routine procedure of providing direct

notice to no one of the right to appeal, fails to satisfy the requirements *Flatford* clearly establishes.

Accordingly, the City is not entitled to summary judgment in its favor on this claim.  To the contrary,

judgment as a matter of law in favor of Plaintiffs may be appropriate.

**Overlapping Claims – Conclusion**

For these reasons, the Court concludes that denial of the defense motion for summary

judgment is appropriate to the extent the motion applies to Plaintiffs' claim based on the failure to

provide notice and opportunity for post-deprivation review.  The Court further concludes that

Defendants are entitled to summary judgment on Plaintiffs' other overlapping claims.


Dated:     January 28, 2015                         /s/ Robert J. Jonker
                                                    ROBERT J. JONKER
                                                    UNITED STATES DISTRICT JUDGE